All right. Mr. Gray, we'll hear from you first. Good morning. Thank you for your recognition, your honor. May it please the members of the court council, I'm here today on behalf of Mr. Red Legs seeking that this court remand the matter back to district court with instructions at a new trial be granted. And the basis for our argument or the basis for our request is that improper expert testimony was presented to the jury. And in short, as the expert witness described to the jury and described to the court during a Dalbert challenge, comparison work is very simple. And our position is that very simple comparison work should not be the basis of an expert opinion that goes to the issue of identification. Now, without diving too deeply into the facts of the case, and of course, if the court should direct, I certainly will. But the primary issue that we're addressing is in this matter, Ms. Pritzkau, my client's on-again, off-again girlfriend, after going into his wallet, finding his Gmail account and his password, logged onto his account and later found photos of a vagina. Initially, she thought it might be of her because of the previous relationship that she had been in, but then she became concerned that it was her 10-year-old daughter. She took screenshots of these photos. She took her 10-year-old daughter to have a forensic interview. During the interview, the 10-year-old daughter didn't recall anybody taking photographs of her vagina, but the prosecution did submit the photographs that were also later found, not only on Ms. Pritzkau's phone after she accessed Mr. Redleg's account, but also found in Mr. Redleg's account after a subpoena was issued to Google. The photographs were submitted for comparison work to the FBI. In order to complete that comparison work, the FBI also had photographs of Mr. Redleg's fingers and knuckles taken to compare with the photograph of the vagina that also contained photographs, I'm sorry, pictures of knuckles and finger creases pulling aside the underwear. At trial, Mr. Immel testified that he could do a very simple comparison work, look at the photographs in the known image of Mr. Redleg's fingers, compare those to the fingers that were contained in the explicit photograph, and then he was able to come to a conclusion that he was able to provide to the jury. Our concern was... Which was what precisely? Precisely that they appeared to be similar, or that they appeared to be... That sounds like the language the judge was quoting. That's correct, so he did not provide a statistical analysis, he didn't say that there's a 97% probability or something along those lines, but rather he gave that they appeared to be similar, which I believe was the precise language that he used. Our position is that is still a prejudicial opinion to provide to the jury because it's coming under what I'll call the aura of an expert opinion. This is not some way opinion coming in to say, well, they look the same to me. This is somebody whose expertise was provided to the jury, albeit a number of other scenarios or different areas, to come forward and say, I've done thousands of comparison work studies, and this is what I conclude here. Now, the real issue, I suppose, just to state it succinctly, the concern is with this simple comparison, we don't know if there's any error rates. We really don't know how reliable this kind of testimony is. There's really no way for us to know, and that can certainly then lead to the real risk of false positives or misidentification. If we compare... Mr. Gray, I think that, as I understood it, this expert had a lot of experience in comparing things, items, and examples of trucks or houses or items, but not as much with trucks, for example. Would you be making the same argument that it is not permissible expert testimony? I'll just be very blunt. I'm not sure if I would or not. Trucks are certainly a lot different and something that's a lot more readily comparable for us as laypeople. Or, for example, if we look at faces, the expert testified that I think that facial recognition is something almost like 100%. But notice that's something that we, as people, routinely do. When we logged on this morning, we all recognized each other. We are usually recognizing each other by our faces. Doing knuckle print comparisons is not something that we typically do. So this is certainly something that is a lot more nuanced, I think is the right word to say. And so where an expert, for argument's sake, let's say that he is well qualified in certain generic things, that expertise does not necessarily cross over into something that's very nuanced and has not been carefully studied yet in terms of what do all these different characteristics mean. If we go back to fingerprints, for example, they have spent a lot of time researching what the different swirl patterns mean or how many people have such and such patterns. I'm sorry, that kind of information is perhaps being developed in the scientific community, but that's not what Mr. Immel was utilizing. He specifically said during the Daubert hearing that he doesn't use that body of research when he's coming to his own conclusions. Rather, what he's doing is a very simple comparison work. He looks at photograph A and photograph B. And so perhaps to come back to your question, I don't mean to give you such a roundabout answer, but we seem to have an expert that has expertise generally or generically in looking at a whole host of items. So the real question is, does that then translate or come into something as nuanced or, I think, frankly, as complex as knuckle prints? So if the methodology or the process is sort of accepted in the identification community, for lack of a better term, why isn't then its application here to this sort of less common area just a matter for the jury to determine whether or not it's sufficient for purposes of expert testimony and whether they think they should buy it or not? So I hear you answering or asking two questions, and I'll answer your last one first. Why not let the jury just kind of sort this out? They had a chance to hear the expert be cross-examined. But the issue is one of Rule 702. It's a rule of evidence, which is a legal question for the court to answer. Does this type of generic comparison analysis meet the Daubert challenge? And so it's really a question of admissibility as opposed to weighing it out would be our position. And as I understood the court's other question, I want to make sure I answer that. If we have other areas, for example, fingerprint analysis, using what we could call a similar process or methodology, I believe ACE-V was specifically mentioned by the experts. The important distinction there is that the fingerprint community, we'll call them, utilize that process over a long period of years. There's been a ton of research, a ton of studies, a number of other experts in the area conducting peer review in those specific areas. That's very different than what Mr. Immel's doing here, which is where he simply says, well, I'm using this process or I'm using this method. I'm not consulting anybody else's research in the area. I'm simply looking at these two different items to try to compare if they're the same. ACE-V can be very important as both sides agreed to during the Daubert challenge. But the difference is, is it being utilized to develop a body of knowledge as opposed to just being generically used? And I don't want to sound glib, but I mean, ACE-V sounds a lot like the scientific method that we were all taught when we were growing up in school. Scientific method is great, but before it can be used in a specific area for identification, it needs to go through development. It needs to be properly peer reviewed. And we need to know what characteristics are important for making these identifications. And so if we look at the testimonies that came in at the Daubert challenge, if we've got this body of research that's being developed in the scientific community, and it's strongly indicating to us that this is a complex field. It's not as simple as facial recognition or as simple as generically looking at trucks. There's a lot more involved here. That research needs to be developed and it really needs to be used by experts. So that way the court can make sure that it's following the Daubert function under rule 702, as opposed to just giving it to the jury and letting them sort that out. Rule 702 stands as a safeguard to make sure that they're receiving reliable information. And at this point, without peer review, without error rates, without further study, we just don't know that it's reliable to look at photograph A, then look at photograph B and say it appears to be the same. If there's no further questions at this point, that's the analysis I had at this point. And so I would request to reserve the rest of my time for rebuttal. Well, if I could just ask one thing before you reserve. The government's brief, as I recall, argues in the alternative that any error here would have been harmless because of the strength of the balance of the evidence. Would you like to address that point and why you think this Daubert, I mean, this expert evidence affected substantial rights if it were erroneously admitted? Sure. Is the evidence prejudicial or was the case of the prosecution submitted so overwhelming? Our position is that the defense that we presented to the jury, the prosecution's case is that Mr. Redlegs goes into the 10-year-old's bedroom at night after she's asleep. She's in bed, her eight-year-old brother is also in the same bedroom. Mr. Redlegs, if he was guilty, must have had to take the covers off the 10-year-old in order to look at her. He would then have had to pull back her underwear without waking her up. And according to Agent Immel, flash photography was used to take both of those photos. So we would have to have Mr. Redlegs being to sneak into the bedroom, uncover the alleged victim, move the underwear, take the photographs, not wake her up, and then have the alleged victim say, I just don't remember anybody taking my photos. What was the defense theory that the victim was not really the victim, that the photo was of some other female or was it was of some other perpetrator? What was the theory of the defense? So we did advance both. Ms. Pritzkel initially said she couldn't recognize if the vagina was hers or somebody else's. Now of course there were blankets and that type of thing in the background and presumably the jury found against us on the issue of the identity of the vagina. But the next question then becomes whose identity are the fingers in the photograph? Ms. Pritzkel is the one that went into Mr. Redlegs' wallet to get the email address. She's the one that stole the information. She's the one that got onto the account when she knew or at least she suspected that Mr. Redlegs would not know that she was getting into the account. She had seen Mr. Redlegs earlier with another woman. She admitted, she denied having any jealousy, but she admitted to still having feelings for Mr. Redlegs. She was an alternative suspect, is that your theory? She was a potential alternative suspect. So although I don't have proof beyond a reasonable doubt that she's indeed the third party, it's our position that there's reasonable doubt that there could have been a third party perpetrator, could have been in this particular case that took those photos and that identification really is key. Okay. I'll, I don't want to take all of your rebuttal time, but I appreciate your addressing that point. Thank you, your honor. All right. Very well. Mr. Miller, we'll hear from you. Thank you, your honor. Good morning. My name is Jay Miller. I'm an assistant United States attorney representing the United States in this matter, in this appeal, and I'm requesting that this court affirm Mr. Redlegs' conviction in all respects. The issue before this court is whether the district court abused its discretion in allowing a forensic examiner, Emil, to testify about the pattern-based examination that he conducted. It's the government's position in this case that the district court did not. When the standard of review is abuse of discretion, the district court enjoys broad latitude of gatekeeping functions when it decides how to determine a specific piece of evidence as reliability. And in fact, based upon the wood versus Minnesota mining case, the exclusion of an expert's opinion is proper only if it is fundamentally unsupported so that it cannot offer any assistance to the jury and deference is see and hear all the evidence. So I think what is important here is to look at the procedural history of what happened in this case and what action the district court took both before making its ruling and in doing so. In this case, the government filed a notice of intent to offer the expert testimony of the FBI forensic examiner. In response to that motion, Mr. Redlegs filed a motion requesting a Daubert hearing regarding the admissibility of this evidence. The district court granted Mr. Redlegs' request and a Daubert hearing was held. At the Daubert hearing, both the proposed expert for the government, Anthony Emil, and the proposed expert noticed up by Mr. Redlegs, Dr. Langenberg, testified and both were subject to cross-examination. And the government feels that's a very important part in that not only did one of the two proposed experts testify, but they both did and they were both subject to cross-examination. As a result of that fact, the district court made its ruling based on a very well-developed record as to whether the forensic examiner's comparison analysis was sufficiently reliable under the Daubert standing. And also as a result of that hearing, it provides this court with a thorough record on which to review the district court's reasoning in terms of determining if it abused its discretion. A review of that record shows that the district court correctly went through the Daubert procedure. At the conclusion of the Daubert hearing, the district court concluded that the government met the Daubert standard and it allowed the government to present the expert testimony of the government's forensic examiner, Anthony Emil. The district court found that the government's expert was qualified as a forensic examiner to assist the jury as the finders of fact based on his years of experience as a forensic examiner in performing 800 of these types of examinations. In so ruling, the district court reasoned that rule 702 of the rules of evidence is a rule of admissibility rather than a rule of exclusion, which is a proper review of the law. The district court also relied on the proper burden of proof for the admissibility of the evidence and that is by preponderance of the evidence standard. The district court also relied on the proper rule 702 a criteria for the admission of the expert testimony. In doing so, the district court accurately concluded that the question of whose fingers were depicted on the pornographic images was not only relevant but central to the issue at case and that is important. In listening to Mr. Redlegs' opening arguments to this court, they said their issue or defense at trial was twofold. The reality is their defense at trial was really this is a whodunit. Who took these pictures? Did Mr. Redlegs take these pictures or was he framed by his girlfriend who was upset at him? The evidence at trial really showed that it was uncontroverted who the pictures were of. The picture of the vagina in this case showed a Tanner three-stage female, which is a child, a prepubescent child, not an adult woman creating any question as to who the alleged victim was in this case. In addition, the clothing of the victim, the bedding which was seized the very next day by law enforcement and an injury to the child's fingers, all of which were documented both in known images taken the day after the pornographic images were taken and the unknown images and the pornographic things show that they were exactly the same. So the reality is who these fingers were was the central issue in the case. That was the defense at trial. In going through the other 702 factors, the district court properly found that the ACE-V method, which was the method used by forensic examiner Immel, is an accepted method or process in doing the comparison analysis. That was uncontroverted that the ACE-V method is an accepted method in the scientific community. Mr. Miller, as I understood at least part of your testimony was helping the jury sort of do that comparison on their own. What's the difference between that and an expert and could you have just presented him as a in some other fashion? Can you help me understand the difference between those two positions? Based on his years of education and training and the amount of comparisons he did, he would qualify as an expert rather than just somebody coming in saying, well, look at this, look at this. Say, for example, me standing up and closing arguments and telling the jury, pointing out certain things on both the known and unknown pictures and comparisons. Mr. Immel, based on his years of experience and training, was able to provide those tools to the jury to make their own determination if the known and unknown images of the fingers were the same. His testimony added something that may not be obvious to a layperson, such as myself pointing it out or the jury viewing these items in terms of the knowns and the unknowns in terms of trying to distinguish whether the fingers were the same or not. So we do think that his testimony was qualified as an expert testimony and therefore proper. Now, moving on, in terms of the image or the question raised by the defense in what they felt was lacking in the 702 was that Mr. Immel was more of a generic expert, kind of a jack-of-all-trades master of none, and that he didn't follow the proper procedures, which is one of the rule 702 factors. In making its ruling, the district court specifically noted that Red Legs' expert, Dr. Langenberg, challenged the qualifications of Mr. Immel and his application of the ASV procedures. Despite all of that, and the district court even went so far as to acknowledging the high level of expertise of the defense's or Mr. Red Legs' expert, Dr. Langenberg, he praised him up and down, the district court did. Despite all of that, the district court did not see Mr. Red Legs' challenge sufficient to disallow the testimony, noting that the government must establish the evidence only by preponderance of the evidence. In doing so, the district court did not abuse its discretion in that the disagreement between the experts for the parties was admissible by both experts so that the jurors of priors of fact could ultimately resolve this dispute. In other words, the issues raised by the defense regarding is Mr. Immel truly an expert in this area, did he properly apply the ASV method, did he accurately do so, those were all questions that to the weight of Mr. Immel's testimony, not its admissibility. What about the application of this ASV methodology to this particular type of image of knuckles and hands, which I think that the government's expert said he had limited experience with, I think maybe even single or double digit times that he had done this. Why isn't that significant, particularly when there's no, I mean he testified that his peers looked at his work, but that there's no real peer review publication or examination of this particular methodology as to fingers, knuckles, hands, human skin. Forensic Examiner Immel addressed that issue and he said all of the examinations I do are pattern-based examinations, whether I'm looking at a truck, which is the example that you referenced earlier, or an apartment, or a body part, a finger, they're all pattern-based examinations and I have done 800 of those and you are accurate in terms of the amount of knuckle comparisons he did, I believe the testimony is he had done approximately 12, so that is double digits. But what Mr. Immel testified to is that when I come across an area like this, because I'm not an anatomy person, I didn't get my college degree in anatomy, I spoke to, in this specific case, an anatomy professor from, I believe it was, I might misspeak here, but I want to say Georgetown University, but he talked to a specific professor who is an expert on anatomy to figure out what he needed to know to do this comparison. So he says the shortcomings I have, because I do all different types of pattern-based examinations, I consult with other experts to get me to the information I need to conduct the examination. And so I feel, and all of this, the lack of experience he had in doing this particular type of examination was addressed both on cross-examination of him and through the defense's experts. So again, I think it goes to the matter of weight, not admissibility. What about the fact that there's no, apparently there's no data on a rate of false positives or false negatives? That's one of the Dawbert factors, as I recall. That is one of the Dawbert factors, but the Dawbert factors are not exclusive. No, they're not, but what about the fact... Excuse me, your honor, I didn't hear that. Yeah, I know they're not exclusive, but what about the fact that we don't have that, those sort of data in this case? The government submits that based upon the case law that's out there, that single prong of the Dawbert factor that is missing is not fatal to the admissibility of the testimony. And in its data on error rates, but nonetheless, the evidence was admissible. So although that prong is missing, it is the government's position that that is not a fatal absent element. At the end... I know you've kind of given me the bottom line, but could you elaborate on why that shouldn't be a greater concern? Because Forensic Examiner Emile says that he found 16 points of comparison, and as a result of that, there is specific factual information that is very reliable for the jury to look at and compare. They don't have to just accept his testimony, they could look for themselves, and again, he just gave them the teaching methods of how to do so. And as a follow-up to that, moving on then to the final position the government has is even if this court finds that the district court erred in admitting the testimony of Forensic Examiner Emile is the government's position that the evidence was so overwhelming that any error, such error, was harmless. I already addressed my first point on this in that the evidence showed uncontroverted that the female depicted in these images were 10-year-old LBE. Redlegs was present in LBE's home on the night of September 24th, 2018, which is the date this offense is alleged to have occurred. LBE's mother testified that Redlegs entered the bedroom where LBE was sleeping on two occasions at around midnight on the night of September 24th of 2018. The evidence also shows that the pornographic images were taken at 1144 and 1145 p.m. on that evening, which is consistent with the testimony of the mother. The model number of the phone or the brand or maker model of the phone was an LG phone. That is very important in that the images that were found on the defendant's email account was from an LG phone. Also, the mother of LBE, if she were to truly have framed Mr. Redlegs, her phone was a Samsung, so it was impossible that she was the one that took those pictures. Mr. Redlegs' counsel in its opening statement to this court said how maybe impossible it would be for the defendant to have entered the bedroom, used a flash photography, and took these pictures without waking the victim up. That's true for no matter who took these pictures. In addition, these images were found on Mr. Redlegs' account. Not only were these images found on his account, but other images, I believe it was approximately 17 other pictures taken from the same day of himself and other children of his were found on the bottom. At the end of the day, the evidence was overwhelming and any such error was harmless. Thank you. I see I've run out of time. All right. Thank you for your argument. Mr. Gray, we'll hear from you in rebuttal. Thank you, Your Honor. Mr. Immel might be well qualified with ASPE, but by his own admission, those qualifications don't permit him to do fingerprint analysis. They don't permit him to do handwriting analysis. I would suspect they don't permit him to do ballistic analysis or DNA analysis because he doesn't have the expertise in those areas. ACE-V stands for Compare, Evaluate, and Verify. It's extremely generic. He should have more expertise before he's able to give an opinion as to identification. Having done 12 comparisons of the hands, and I think he said having done three or four comparisons of just the portions of the finger, really doesn't help him get past the Dalbert gatekeeping function of the district court. In terms of whether or not his evidence was prejudicial, the main issue was whose fingers were in that photograph. The prosecution submitted an expert opinion as to identity, and it is for those reasons we would ask that this court remand with instructions for a new trial. Very well. Thank you for your argument. The court appreciates your willingness to accept the appointment in this case under the Criminal Justice Act. The court also appreciates Mr. Miller's argument. The case is submitted. The court will file a decision in due course.